986 F.2d 1424
 16 Employee Benefits Cas. 2357
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Eugene BARKER, Don Bodinger, Ray Ferris, et al., Plaintiffs-Appellees,
v.
PULLMAN, INCORPORATED, Pullman Standard, Incorporated,
Pullman-Peabody Company, Successor by Merger to
Pullman Transportation Company,
Incorporated, et al.,
Defendants-Appellants.
 No. 91-3904.
 United States Court of Appeals, Seventh Circuit.
 Argued Oct. 19, 1992.
Decided Feb. 19, 1993.
Rehearing and Rehearing En Banc
Denied March 15, 1993.
 
 1
 Before CUMMINGS and MANION, Circuit Judges; and FRANK A. KAUFMAN, Senior District Judge*.
 
 ORDER
 
 2
 The plaintiffs, Phillip Przybylinski and John Spence, filed suit under the Employee Retirement Security Act of 1974 ("ERISA"), 29 U.S.C. sections 1001-1461, claiming that they are entitled to a bonus under an employee benefits plan instituted by the defendants ("Pullman"). The district court entered summary judgment in favor of the plaintiffs based upon equitable considerations. We reverse.
 
 I. Facts
 
 3
 Prior to 1979, Pullman manufactured both railroad passenger cars and freight cars. The company was divided into two primary manufacturing groups--the Passenger Car Works ("Passenger Unit"), and the Freight Car Unit ("Freight Unit"). The plaintiffs were among several engineers employed in the Passenger Unit's engineering department ("Hammond engineers"), located in Hammond, Indiana. In March 1979, Pullman decided to phase out the Passenger Unit upon the completion of existing orders. But the company was concerned that without future employment security key employees might leave, thus jeopardizing the completion of the remaining orders. To induce employees to remain with the Passenger Unit until existing orders were completed, in May of 1979 Pullman President James McDivitt announced a special severance program. The severance program granted the Passenger Unit's skilled employees who stayed on the job another position within Pullman when their jobs ended. Alternatively, for those employees for whom a new job was not available, McDivitt promised severance benefits and a bonus ("McDivitt bonus") upon their termination. McDivitt's May 14 letter announcing the severance program set out the terms of the proposed bonus.
 
 
 4
 For those people we cannot place within Pullman Incorporated organizations, we are planning to handle all separations as equitably as possible. Therefore, any terminations after May 1, 1979 of salaried, exempt non-bargaining employees (other than resignation, normal retirement or discharge) will be treated as laid off for lack of work and will be paid a bonus of four (4) weeks base salary, exclusive of COLA or overtime. An additional bonus week will be paid for each month or part thereof which is worked subsequent to May 1 (with a maximum of twelve bonus weeks), provided you remain on the job assigned until the company releases you.
 
 
 5
 (Emphasis in original.)
 
 
 6
 During personnel meetings held after McDivitt announced the severance package, eligible employees questioned whether they would be able to reject the offer of placement in a new job, and instead take advantage of the bonus and severance pay when their job terminated. McDivitt answered these questions in a May 23 letter as follows:
 
 
 7
 If an exempt employee feels that an unreasonable offer has been made, either in salary, functional area or geographic location, that individual is welcome to avail himself/herself of the option of taking the bonus and severance pay for which he/she is eligible.
 
 
 8
 In October 1979, Pullman transferred the Hammond engineers, including the plaintiffs, to the Freight Unit's advance products group ("APG"), located in San Diego, California. Pullman anticipated that the Hammond engineers would someday move to San Diego, but decided to keep them in Hammond until then. Pullman recognized that this arrangement put the engineers in a difficult situation--while they would be willing to stay in their positions while located in Hammond, some would be unwilling to make the move to San Diego. To accommodate these employees, Pullman extended the Passenger Unit severance benefits to the engineers assigned to APG. In that way, a transferred engineer would be able to reject any future move to San Diego and avail himself of the severance package offered to the Passenger Unit employees. Pullman announced its reassignment of the engineers and the extension of benefits in an October 1, 1979 letter. The portion of that letter concerning the extension of benefits states:
 
 
 9
 All benefits presented to Passenger Unit employees will remain in effect for people included in this reorganization. This includes the option of severance and bonus pay for which a person may be eligible.
 
 
 10
 On July 1, 1980 Pullman offered the severance program formerly restricted only to Passenger Unit employees to all Pullman employees, under Pullman's General Policy # 20. This program became known as the Gen-20 plan and covered the Hammond engineers, including the plaintiffs, who were at that time assigned as engineers at APG. On August 16, 1982, Pullman discontinued the APG and placed the Hammond engineers under the dominion of a different department--the Product Engineering Department. This change had little effect on the lives of the plaintiffs. They continued to perform the same jobs, at the same location,[1] and to receive the same salary. Their employee records indicated only that the name of their division changed. The plaintiffs claim that they were never informed and were not aware of this structural reorganization.
 
 
 11
 In February 1984, Trinity Industries, Inc. purchased Pullman. Trinity employed the Hammond engineers, including the plaintiffs, in the same jobs they had with Pullman. Because the purchase was considered a severance from Pullman, the plaintiffs recovered benefits from Pullman under the Gen-20 plan. The plaintiffs nevertheless filed suit to recover the McDivitt bonus as well, and the district court entered summary judgment in their favor. The district court ruled that the plaintiffs "technically" lost their rights to the McDivitt bonus when they were employed by the Product Engineering Department in 1982, but that they were entitled to recover the McDivitt bonus "for equity reasons." Pullman appeals that judgment.
 
 II. Standards of Review
 
 12
 We review the district court's grant of summary judgment under a de novo standard. Prince v. Zazove, 959 F.2d 1395, 1398 (7th Cir.1992).[2] Summary judgment is authorized if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). Because ERISA preempts state decisional rules, we construe ERISA plans by referring to federal common law rules of contract interpretation. Hammond v. Fidelity and Guaranty Life Insurance Company, 965 F.2d 428, 430 (7th Cir.1992). Our interpretation does not deviate significantly from state contract interpretation rules--we interpret ERISA plans in an ordinary and popular sense as would a person of average intelligence and experience, and we construe ambiguities in ERISA plans against the drafter. See id.
 
 III. Analysis
 
 13
 The sole question in this case is whether the plaintiffs' right to collect the McDivitt bonus extinguished when they were employed by the Product Engineering Department on August 16, 1982. Pullman concedes that the plaintiffs acquired a right to receive severance benefits under the Gen-20 plan by virtue of the May 14 letter to the Passenger Unit employees. Pullman also concedes that in October 1979, this right followed the Hammond engineers, including the plaintiffs, to their new positions with the Freight Unit's APG. Pullman contends, however, that by the express language of the May 14 letter, the right to receive the McDivitt bonus vested only for those employees whom Pullman terminated without placing into other positions within the company. Because the Hammond engineers were placed in the Product Engineering Department on August 16, 1982, Pullman contends that it satisfied its obligation to the plaintiffs arising from the May 14 letter.[3] Essentially, Pullman takes the position that because the plaintiffs were placed in another job within the company, their rights to the McDivitt bonus never vested. The plaintiffs disagree that the 1982 reorganization in which they were placed under the dominion of the Products Engineering Department fulfilled the placement requirement. They point to the fact that they did not even know of the reorganization, and therefore were never given an opportunity, announced in the May 23 letter, to reject unreasonable offers.
 
 
 14
 According to its plain language, the May 14 letter conferred the McDivitt bonus only upon those employees who were terminated without being placed in another job within the company. In 1982 the plaintiffs were placed in another job within Pullman--even though they continued to perform the same work, at the same place and the same salary, they did so for the Products Engineering Department rather than the APG. Pullman had terminated the APG through its reorganization, but found a way to continue to employ the plaintiffs. Therefore, Pullman fulfilled its obligations under the May 14 letter by placing the Hammond engineers in the Products Engineering Department when the APG was discontinued.
 
 
 15
 Pullman's only possible breach was under the October 1 letter, for failure to allow the plaintiffs to reject the transfer to the Products Engineering Department and instead to accept termination (and the McDivitt bonus) at that time. In this lawsuit, however, the plaintiffs do not seek redress for that possible breach. They do not claim that if given the choice in 1982 they would have rejected transfer and instead accepted termination and severance benefits. It is not altogether certain that if given the opportunity in 1982, the plaintiffs could have invoked the May 23 letter to reject a move to the Products Engineering Department. The May 23 letter allowed rejection only of an "unreasonable offer" in the areas of "salary, functional area, or geographic location." The 1982 transfer was patently reasonable--it carried the same salary, and the plaintiffs worked in the same functional area and geographic location.
 
 
 16
 In summary, Pullman fulfilled its obligations to the Hammond engineers by placing them under the dominion of the Products Engineering Department in 1982, rather than eliminating them along with the APG. This event advanced the purposes of the May 14 severance plan--to place employees whose positions happened to terminate into other positions within the company. Any other result would so expand the reach of the May 14 offer as to contradict it.[4] The Hammond engineers benefitted by Pullman's diligent efforts to keep them employed even as the company experienced a major reorganization. This effort at continued employment was the basic promise made in the May 14 offer.
 
 
 17
 Accordingly, we reverse the judgment of the district court and grant Pullman's motion for summary judgment on the issue of the McDivitt bonus.
 
 
 
 *
 Hon. Frank A. Kaufman, Senior District Judge for the District of Maryland, is sitting by designation
 
 
 [1]
 The anticipated relocation of the engineers to San Diego never took place, and they continued to work in Hammond
 
 
 [2]
 Although the decision of the plan administrator is given some deference in certain categories of ERISA cases, both parties in this case concede that de novo review is appropriate
 
 
 [3]
 The APG terminated plaintiff Spence on February 27, 1981, and he began to receive his benefits conferred by the May 14 letter. On May 4, 1981, the APG recalled Spence to work, with assurances that he would maintain his rights to the McDivitt bonus upon any subsequent termination of employment. Pullman agrees that Spence maintained his rights to the McDivitt bonus after he was recalled to work, but argues that this right extinguished when he was placed in the Product Engineering Department in 1982
 
 
 [4]
 The purpose of the May 14 offer, as manifest in the letter itself, was to prevent an exodus of skilled Passenger Unit employees before the completion of existing orders. The severance benefits were a guarantee of compensation to all employees who stayed the course--who remained with the Passenger Unit until it finished its work. These benefits were extended to the Hammond engineers transferred to the APG to give them an option if their department moved to San Diego. An award of benefits under the May 14 offer because of the "termination" occasioned by Trinity's purchase in 1985 would facilitate none of these purposes. By 1985, the Freight Unit was long gone, and the Hammond engineers were provided continued employment with the company. The move to San Diego never took place; therefore, the Hammond engineers were never faced with the prospect of a move, and the option to accept the May 14 benefits